IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CAROL SNYDER,<br><br>    Plaintiff,<br><br>v.<br><br>THE NEBRASKA MEDICAL CENTER<br>and NEBRASKA MEDICINE,<br><br>    Defendants. | 8:20CV196<br><br><br>**MEMORANDUM<br>AND ORDER** |

  This matter is before the Court on defendants The Nebraska Medical Center ("Medical Center") and Nebraska Medicine's ("Nebraska Medicine" and collectively, "defendants") Motion for Summary Judgment (Filing No. 36). Also pending is plaintiff Carol Snyder's ("Snyder") related Motion to Exclude Defendants' Rebuttal Evidence, or in the Alternative, for Leave to Submit Sur-Reply (Filing No. 54). For the reasons stated below, Snyder's motion is denied and the defendants' motion for summary judgment is granted.

**I. BACKGROUND**

  Snyder is an experienced human-resources ("HR") executive. On September 25, 2017, she began working for the Medical Center as an HR Business Partner ("HR Business Partner")—a position that is exempt from the overtime requirements of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq*. Snyder and the other HR Business Partners reported to Andy Noon ("Noon"), the Medical Center's Director of Talent Management. Noon, in turn, reported to Chief Human Resources Officer Frank Venuto ("Venuto").

  Snyder's primary role was to support Julie Lazure ("Lazure") and her team. Lazure is the Vice President for Operations for Acute Care, and she oversees the emergency department and inpatient operations and services. Lazure saw the HR Business Partner as

an "HR Expert" who could help with complex issues, review issues related to turnover and engagement, and provide guidance on leader development. As a result of the 24/7 nature of acute care, Lazure expects leaders in her department to be visible and available. She expects them to show up to meetings because the staff will receive a negative message if they don't.

Noon likewise believes it is important for human resources team members to be at work. Noon nonetheless allowed Snyder and other members of his team the flexibility to occasionally work from home, though he still generally expected an eight-hour shift. Snyder states Noon never communicated those expectations to her. As a salaried employee, she expected to work as much as required to get her work done.

Between 2017 and 2019, each individual manager had discretion to determine whether and to what extent to permit employees to work from home. Managers also had discretion in managing their employees' Paid Time Off ("PTO").

The Medical Center's PTO policy permitted employees to use PTO for planned absences, like vacations and medical appointments, and for unscheduled absences, including those due to unforeseen illness. The policy directed employees to report unscheduled time off in accordance with established standards. If an HR Business Partner wanted to use PTO, they would record it in the Kronos database. Noon monitored the database for all HR Business Partners and approved their requests for leave.

About two months after she began working for the Medical Center, Snyder started reporting that she was unable to come to work because she did not feel well. At times, she told Noon she would work from home, other times she did not. Some absences were recorded as PTO, others weren't. By the defendants' count, between October 25, 2017, and September 28, 2018, Snyder was out of the office at least 62 days while employed at the Medical Center—far more than other HR Business Partners. More precisely, the defendants report Snyder "was unable to report to work due to illness or injury 26 times,

requested to work from home without a stated reason 12 times, worked from home without notifying Noon 6 times, and worked from home 1 day due to a family member's appointment." They further note "[s]he also took 14 days of PTO and stated she would put in PTO for 3 additional days but failed to do so." By comparison, the defendants state that, excluding PTO and using Snyder's calculations, the four other HR Business Partners worked from home as few as one and no more than twelve days in that same period.

Snyder maintains she always had Noon's permission to work from home and that if she was unable to work, she used PTO. Snyder states her "requests for time off, to work from home, and PTO entry practices were not dissimilar from other [HR Business Partners]."

Lazure was generally satisfied with Snyder's actual work performance, but in the fall of 2018, she received complaints from three different people that Snyder was canceling meetings, which caused frustration and disruption when they had to be rescheduled. Previously unaware of the issue, Lazure confirmed the cancelations with her secretary. Lazure then informed Noon that Snyder was canceling meetings at the last minute and that it had been happening for a while. Lazure explained the cancelations were causing problems for her team because they needed Snyder present and available to support them. At the time Lazure advised Noon of the issue, Snyder was out of the office for a week.

Noon began investigating Snyder's attendance. He reviewed his emails and text messages to determine how often she was absent. He also checked whether she entered all her absences as PTO. Noon learned Snyder had not recorded most of her illness-related absences as PTO. Noon also identified at least five instances where Snyder canceled a meeting because she was sick.

Noon met with Snyder on October 1, 2018, to discuss her absences. When he noted she had not recorded PTO to cover all of her sick days, Snyder responded that she had worked from home. Noon told Snyder he never said she could work from home when she

was sick. He later testified he assumed she would not be working a full shift when she called in sick. Snyder responded she would just come to work sick. At the end of the meeting, Noon told Snyder to give the matter more thought and they would meet again in two days.

Noon testified that after the meeting, he was leaning toward discharging Snyder but wanted input from employee relations, internal legal counsel, and Venuto. Noon ultimately determined discharge was the best course because he thought Snyder was defensive and he felt like trust "had been broken with [the] operations team." On October 2, 2018, Noon advised Lazure that he thought they needed to "go in a different direction" with Snyder. He asked for Lazure's input, saying he had "lost confidence." Lazure, who had met with Snyder for two hours and found her "apologetic and embarrassed," responded, "Part of me says give her a second chance . . . I don't know if she can be successful. She has missed a lot of work. We need her here[.]"

After meeting with Noon on October 1, 2018, Snyder spoke with the Medical Center's in-house counsel, Aimee Bataillon ("Bataillon"), about her discussion with Noon. Snyder and Bataillon discussed Snyder's medical condition and that Noon "was not offering family medical leave to [her]." Snyder reports Bataillon also advised her how to apply for leave under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.* Bataillon did not tell Noon about her discussion with Snyder, and he was not aware they met before Snyder's discharge.

On October 2, 2018, Snyder created an online account through the Medical Center's third-party FMLA administrator. Snyder did not submit a request for leave at that time. She testified she could not submit a claim online.

The next day, Noon terminated Snyder's employment. He notified her she was being terminated for timecard falsification and her lack of availability. Snyder attributes most of her absences to a long history of migraines caused by severe anxiety and

4

depression. In addition to migraines, Snyder experiences blurred vision, dizziness, and vomiting. In previous jobs, Snyder occasionally worked from home, went on short-term disability, and took FMLA leave as a result of anxiety and depression. In March 2018, Snyder notified Noon she had a migraine but would work from home as much as she could.

Snyder was an experienced HR professional, having dealt with ADA and FMLA requirements and having applied for FMLA leave in a past job. Notwithstanding that experience and knowledge, she never requested a reasonable accommodation for her condition while employed at the Medical Center and did not request FMLA leave until weeks after her termination. Snyder concedes her medical condition impacted her ability to get to work and to perform certain tasks at times but says she always got the job done. She maintains she did not need a formal accommodation or leave until Noon advised her that she would no longer be able to work from home on occasion.

After her termination, Snyder applied for and received Social Security Disability benefits. For purposes of those benefits, she has been disabled since October 3, 2018—the date of her termination.

In applying for benefits, Snyder asserted her medical conditions were not related to work. The defendants state that on her application for benefits, Snyder asserted, "When I have an episode, I get blurred vision, dizzy, nausea and headaches. I have these episodes 4-5 x per day, every day. Hard to concentrate and move around, limited motion. I need to lay down when these episodes occur. Cannot work or drive when I have these episodes." Snyder does not deny making those statements but questions their materiality. Snyder explains her termination and the accusations of dishonesty exacerbated her anxiety and depression. She states she nonetheless continues to try to find employment that will accommodate her medical conditions.

Snyder timely filed discrimination charges with the Nebraska Equal Opportunity Commission and the federal Equal Employment Opportunity Commission. Both issued notice of her right to sue.

On April 24, 2020, Snyder sued the defendants in the District Court of Douglas County, Nebraska (Filing No. 1-1), alleging disability discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. § 12101 *et seq.*, the Nebraska Fair Employment Practice Act ("NFEPA"), Neb. Rev. Stat. § 48-1101 *et seq.*, and the FMLA. Snyder briefly alleged the Medical Center failed to engage in an interactive discussion with her regarding "any accommodation she may need" and terminated her employment for pretextual reasons. Snyder also alleged the Medical Center "retaliated and interfered with [her] rights under the FMLA."

The defendants removed the case to this Court on May 26, 2020, and now move for summary judgment on all Snyder's claims. Snyder opposes summary judgment, concluding "genuine issues of material fact are present in this case such that Defendants are not entitled to judgment as a matter of law on either the ADA discrimination or FMLA interference claims."[1]

## II.   DISCUSSION
### A.   Standard of Review

In deciding a motion for summary judgment, the Court views "any facts in which there is a genuine dispute in a light most favorable to the nonmoving party," *Kempf v. Hennepin County*, 987 F.3d 1192, 1195 (8th Cir. 2021), and gives her the benefit of all reasonable inferences supported by the record, *Scott v. Harris*, 550 U.S. 372, 378 (2007). An inference is reasonable if it "can be drawn from the evidence without resort to

---

[1] Although Snyder does not expressly abandon any remaining claims she may have raised in her pleading, as discussed more fully below, that is the practical effect of her narrow opposition to summary judgment. At this point, Snyder states she brings only two claims—"disability discrimination [under the ADA] and FMLA interference."

6

speculation." *Turner v. XTO Energy, Inc.*, 989 F.3d 625, 627 (8th Cir. 2021) (quoting *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1110 (8th Cir. 2001)).

Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit." *Id.* Irrelevant and unnecessary factual disputes do not bar summary judgment. *Id.*

The movant bears the burden of establishing the initial absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). It can meet that burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Id.*

To survive summary judgment, the nonmoving party may not rest on mere denials or unsupported allegations. *See, e.g.*, *Scarborough v. Federated Mut. Ins. Co.*, 996 F.3d 499, 505 (8th Cir. 2021). Nor can she "simply show that there is some metaphysical doubt as to the material facts," but "must come forward with specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)). "Even if some factual dispute exists, the movant is entitled to summary judgment if the evidence, taken as a whole, is so one-sided that a fair-minded trier of fact could not find for the nonmoving party." *Ball v. City of Lincoln*, 870 F.3d 722, 727 (8th Cir. 2017).

**B.      Rebuttal Evidence**

Snyder moves to exclude the defendants' Supplemental Index of Evidence ("Supplemental Index") in support of summary judgment. She alternatively requests leave to file a sur-reply. According to Snyder, the Supplemental Index "contains additional facts and nine additional exhibits that were not previously offered or submitted in connection

with Defendants' Motion for Summary Judgment." Snyder further contends "[o]ne item of evidence [an Employment Status Policy] was not disclosed or previously produced during discovery" and "should be stricken on that basis." Snyder argues the "[d]efendants were required to submit their evidentiary materials and their statement of facts supporting summary judgment at the time of their initial motion and [she] has been prejudiced by the delayed submission." The argument is unavailing.

Most, if not all, of the challenged evidence is well within the range of proper support for a reply on a motion for summary judgment. The defendants' failure to successfully anticipate in their opening brief every aspect of Snyder's response does not preclude them from presenting additional probative evidence in reply. To the contrary, Nebraska Civil Rule 7.1(c)(1) expressly authorizes "a reply brief and index of evidence."[2] The defendants' reply in this case is directly responsive to the issues Snyder raised in her opposing brief. *See* NECivR 7.1(c)(2). Snyder seems to confuse presenting additional responsive evidence—which is allowed—with raising new grounds for relief or presenting new arguments on unrelated matters—which require leave of court. *See id.*

Where Snyder raises questions of nondisclosure under Federal Rules of Civil Procedure 26(a)(1) and (37)(c)(1), she fails to provide sufficient information to warrant exclusion in these circumstances. In any event, the Court finds the challenged evidence does not materially alter the summary-judgment analysis or justify further briefing. Snyder's motion is denied.

### C. ADA and NFEPA Claims

In her complaint, Snyder broadly alleges the defendants discriminated against her based on her disability in violation of the ADA, the FMLA, and the NFEPA. As noted above, in her brief opposing summary judgment (Filing No. 49), Snyder analyzes her discrimination claim under the ADA and her interference claim under the FMLA but never

---

[2]The Court also notes Rule 56 does not restrict the Court to only those materials the parties cite; "it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

mentions the NFEPA or Nebraska law. While that casts considerable doubt on whether Snyder continues to press such a claim, in the end, it makes little difference in this case.

As the Eighth Circuit has explained, "[t]he disability discrimination provisions in the NFEPA are patterned after the ADA" and Nebraska courts routinely look to federal decisions in analyzing NFEPA claims. *Orr v. Wal-Mart Stores, Inc.*, 297 F.3d 720, 723 (8th Cir. 2002) (citing *Father Flanagan's Boys' Home v. Agnew*, 590 N.W.2d 688, 693 (Neb. 1999)). The Court's analysis of Snyder's ADA claim applies to any NFEPA claim Snyder continues to make. *See Ryan v. Cap. Contractors, Inc.*, 679 F.3d 772, 777 n.3 (8th Cir. 2012); *Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1106 n.2 (8th Cir. 2016) (foregoing separate analysis of the plaintiff's parallel state-law claims).

### 1. Disparate Treatment

Given the absence of any direct evidence of disability discrimination, the parties agree Snyder's claims are subject to "the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Evans v. Coop. Response Ctr., Inc.*, 996 F.3d 539, 545 (8th Cir. 2021). Under that framework, Snyder must first establish a prima facie case of unlawful discrimination by showing "(1) [s]he is a disabled person as defined by the ADA, (2) [s]he is qualified to perform the essential functions of h[er] job with or without reasonable accommodation, and (3) [s]he suffered an adverse employment action because of h[er] disability." *Higgins v. Union Pac. R.R.*, 931 F.3d 664, 669 (8th Cir. 2019) (quoting *Cody v. Prairie Ethanol, LLC*, 763 F.3d 992, 996 (8th Cir. 2014)).

If Snyder makes the requisite showing, a rebuttable presumption of discrimination arises and the burden of production shifts to the defendants to present evidence of a "legitimate, nondiscriminatory reason for" her discharge. *McDonnell Douglas*, 411 U.S. at 802. If they succeed, the presumption disappears, and Snyder must show the defendants' stated reasons are pretext for unlawful discrimination. *Id.* at 804.

9

For purposes of summary judgment, the defendants accept Snyder's assertion that her "persistent anxiety and depression" qualify her as disabled under the ADA. *See* 42 U.S.C. 12102(1) (definition of disability). They also do not dispute that her termination was an adverse employment action. Beyond that, they challenge her discrimination claims at every step.

The defendants argue Snyder's disparate-treatment claim fails because she cannot establish that (1) "Noon was aware of her alleged disability" before terminating her employment, (2) she could perform all the essential functions of her job—such as "regular, on-site attendance" and participating in meetings as scheduled—even with an accommodation, and (3) any causal connection between her termination and her alleged disability. *See, e.g., Pickens v. Soo Line R.R.*, 264 F.3d 773, 778 (8th Cir. 2001) ("This court has consistently held that 'regular and reliable attendance is a necessary element of most jobs.'" (quoting *Greer v. Emerson Elec. Co.*, 185 F.3d 917, 921 (8th Cir. 1999))). The defendants emphasize the need for Snyder to be on site and available as an HR Business Partner. The defendants also point out that in obtaining Social Security disability benefits, Snyder stated that she had been unable to work since she was terminated and that her disability was not related to work.

Snyder responds that genuine disputes of material fact preclude summary judgment on her disparate-treatment claim. In her view, a jury must decide (1) if Noon knew about her disability when he terminated her, (2) whether she was able to perform the essential functions of her job while occasionally working from home, and (3) why she was terminated. Snyder admits she "did not formally request an ADA accommodation" but claims it was "because she was fully accommodated by Noon's work from home policy." As Snyder sees it, Noon fired her because he knew she would need an accommodation going forward and was unwilling to let her occasionally work from home.

The Court tends to agree with the defendants that on this record, Snyder is unable to establish a prima facie case of disability discrimination. *See, e.g., McConnell v. Anixter,*

*Inc.*, 944 F.3d 985, 988 (8th Cir. 2019) ("To show a genuine dispute of material fact, a party must provide more than conjecture and speculation." (quoting *Zayed v. Associated Bank, N.A.*, 913 F.3d 709, 720 (8th Cir. 2019))); *Buckles v. First Data Res., Inc.*, 176 F.3d 1098, 1101 (8th Cir. 1999) (explaining the ADA does not require an employer "to provide an unlimited absentee policy" and concluding an "[u]nfettered ability to leave work at any time" was "not a reasonable accommodation"); *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995) (Posner, J.) (explaining the ADA generally does not require an employer "to accommodate a disability by allowing the disabled worker to work, by himself, without supervision, at home"). If nothing else, Snyder never adequately explains how, in these circumstances, her ADA claim and her Social Security disability determination "can comfortably exist side by side." *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 803, (1999) (explaining that "a plaintiff's sworn assertion in an application for disability benefits that she is, for example, 'unable to work' will appear to negate an essential element of her ADA case—at least if she does not offer a sufficient explanation").

As the defendants point out, Snyder bears the burden of explaining "the apparent contradiction" between her description of the debilitating symptoms she described in support of her Social Security disability claim and her current allegations about her ability to perform the essential functions of her job with reasonable accommodations as required for an ADA claim. *Id.*; *accord Norman v. Union Pac. R.R.*, 606 F.3d 455, 460 (8th Cir. 2010) ("An employee may survive summary judgment after asserting a contradictory position if her explanations warrant the conclusion that the employee could perform essential job functions."). Snyder's cursory explanation that her termination "greatly exacerbated her underlying depression and anxiety" and that "[t]he difference in her abilities before and after termination" are "huge" does not suffice. *See*, *e.g.*, *Pickens*, 264 F.3d at 778 (rejecting an ADA disability claim where the employee alleged at the time that he applied for disability benefits that he was completely unable to work).

11

But even if the Court assumes Snyder has established a prima facie case of disparate treatment, her claim still falls short because she fails to create a triable issue as to whether the Medical Center's legitimate, nondiscriminatory reasons for terminating her were mere pretext for unlawful discrimination. To prove pretext, Snyder must show the Medical Center's articulated reasons for terminating her employment were "false and that discrimination was the real reason." *Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1072 (8th Cir. 1998).

Proving "pretext 'requires more substantial evidence' than is required to make a prima facie case because evidence of pretext is viewed in light of [the Medical Center's] justification." *Cody*, 763 F.3d at 997 (quoting *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002)). "A plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010). Snyder tries all three without success.

First, Snyder claims Noon deviated from his unwritten policy allowing unlimited work from home when Snyder was too ill to come to the office, but she does not provide probative evidence that Noon had such a policy or that other HR Business Partners followed Snyder's approach in using and recording PTO. Snyder also points to the Medical Center's Corrective Action Policy for tardiness and absences, arguing she should have received progressive discipline. But Snyder's case does not involve a simple attendance issue. While Noon's investigation may have started with complaints about Snyder's canceling meetings, it did not end there. Snyder's narrow framing of the issue is at odds with the evidence.

The same is true for Snyder's claim that Noon gave "shifting explanations for firing" her because he started to follow up on the complaints Lazure reported but eventually "landed on timecard falsification as reason to fire Snyder." Noon was not bound to the

initial reason he began to look more closely at Snyder's performance. The Court's review of the record indicates the Medical Center's stated reasons for terminating Snyder—availability and timecard falsification—have remained consistent.

As for comparators, Snyder aptly looks to the other HR Business Partners Noon supervised. Yet to show pretext comparators must be "similarly situated in all relevant respects." *McKey v. U.S. Bank Nat'l Ass'n*, 978 F.3d 594, 600 (8th Cir. 2020) (quoting *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 956 (8th Cir. 2012)). "[T]he test for whether someone is sufficiently similarly situated, as to be of use for comparison, is rigorous." *Johnson v. Securitas Sec. Servs. USA, Inc.*, 769 F.3d 605, 613 (8th Cir. 2014) (en banc).

Here, none of the other HR Business Partners even comes close to the roughly forty-five days Snyder was unable to make it to the office in the year she worked for the Medical Center. And there is no evidence that any of them generated complaints about their lack of availability. Put simply, Snyder's proposed comparators did not engage "in the same conduct without any mitigating or distinguishing circumstances." *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000).

In the end, Snyder fails to adduce sufficient evidence to prove that the Medical Center's stated reasons for terminating her employment were false, let alone to establish that unlawful disability discrimination was the real reason for her termination. *See Main v. Ozark Health, Inc.*, 959 F.3d 319, 325 (8th Cir. 2020) ("To prove that the employer's explanation was false, the employee must show the employer did not truly believe that the employee violated company rules." (quoting *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1003 (8th Cir. 2012)). To prove pretext, Snyder "must do more than show that" terminating her was unwise or unfair; she must show that Noon intentionally discriminated against her based on her disability and "offered a 'phony excuse.'" *Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1034 (8th Cir. 2005) (quoting *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004)). Because she has not done that, the defendants are entitled to summary judgment on her disparate-treatment claim.

### 2. Failure to Engage in the Interactive Process

The defendants also challenge Snyder's allegations in her complaint that the Medical Center discriminated against her by "failing to engage in an interactive discussion . . . about any accommodation she may need to perform her essential job functions." If a disabled employee requests an accommodation, their "employer must engage in an 'informal, interactive process' with the employee to identify the limitations caused by the disability and the potential reasonable accommodations to overcome those limitations." *Battle v. United Parcel Serv., Inc.*, 438 F.3d 856, 862 (8th Cir. 2006) (quoting 29 C.F.R. § 1630.2(*o*)(3)). To establish the Medical Center "breached its duty to engage in the interactive process," Snyder must establish (1) the Medical Center knew about her disability, (2) Snyder "requested accommodations or assistance for . . . her disability," (3) the Medical Center "did not make a good faith effort to assist" Snyder in obtaining an accommodation, and (4) Snyder "could have been reasonably accommodated but for the [Medical Center's] lack of good faith." *McNeil v. Union Pac. R.R.*, 936 F.3d 786, 791 (8th Cir. 2019) (quoting *Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 902 (8th Cir. 2009)).

The defendants argue Snyder cannot establish such a claim because she did not inform Noon about her alleged disability and admits she never requested an ADA accommodation during her employment. The defendants further contend Snyder is unable to show she could have been reasonably accommodated given Snyder's stark description of her alleged disability and her need to frequently work from home.

Snyder does not respond to the defendants' detailed arguments regarding her failure to establish any distinct claim that she intended to make based on the Medical Center's alleged failure to engage in the interactive process. Snyder only briefly mentions the claim in her pleading and makes no specific effort to contest summary judgment with respect to that claim. The Court therefore deems any claim based on the Medical Center's alleged failure to engage in the interactive process abandoned. *See Freitas v. Wells Fargo Home Mortg., Inc.*, 703 F.3d 436, 438 n. 3 (8th Cir. 2013) (finding the appellants abandoned a claim by not raising the issue in their briefs).

### D. FMLA Interference

Snyder last alleges the defendants interfered with her FMLA rights.[3] "The FMLA allows eligible employees to take up to twelve weeks of unpaid leave during a twelve-month period to deal with a serious health condition." *Weatherly v. Ford Motor Co.*, 994 F.3d 940, 942 (8th Cir. 2021) (citing 29 U.S.C. § 2612(a)(1)(D)). To protect those rights, the FMLA "makes it unlawful for employers to 'interfere with, restrain, or deny' employees exercising or attempting to exercise" them. *Evans v. Coop. Response Ctr., Inc.*, 996 F.3d 539, 548 (8th Cir. 2021) (quoting 29 U.S.C. § 2615(a)(1)).

"An employer has no obligation to provide leave, however, unless employees provide notice that they 'may be in need of' it." *Garrison v. Dolgencorp, LLC*, 939 F.3d 937, 944 (8th Cir. 2019) (quoting *Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1049 (8th Cir. 1999)). An employee requesting leave generally must follow her "employer's usual and customary notice and procedural requirements." *Id.* (quoting 29 C.F.R. § 825.302(d)).

"To succeed on a claim of FMLA interference, an employee must show she was eligible for FMLA leave, the employer knew she needed FMLA leave, and the employer denied her an FMLA benefit to which she was entitled." *Smith v. AS Am., Inc.*, 829 F.3d 616, 621 (8th Cir. 2016). Even if she does that, her interference claim "will fail unless [she] also shows that the employer's interference prejudiced [her] as the result of a real, remediable impairment of her rights under the FMLA." *Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc.*, 826 F.3d 1149, 1158 (8th Cir. 2016); *see also Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002) (explaining the FMLA "provides no relief unless the employee has been prejudiced by the violation").

The defendants argue Snyder cannot establish her FMLA interference claim because she did not give adequate notice that she needed FMLA leave and has not shown she was

---

[3]As noted above, Snyder has abandoned any FMLA retaliation claim she raised in her complaint. Her opposition to summary judgment does not even mention it.

prejudiced by the defendants' alleged failure to offer her leave. According to the defendants, Snyder "offers no evidence that the alleged failure to offer her FMLA leave" caused her any harm. The Court agrees.

Snyder's underlying allegations of FMLA interference are thin at best. In her opposition to summary judgment on this issue, Snyder briefly attempts to address the defendants' arguments about the lack of adequate notice, but she says nothing about any prejudice she suffered. Even assuming she can prove FMLA interference, her failure to show prejudice is fatal to her claim. *See Massey-Diez*, 826 F.3d at 1158; *accord Thompson v. Kanabec County*, 958 F.3d 698, 706 (8th Cir. 2020) (affirming summary judgment on an FMLA interference claim because the plaintiff failed to "show that she suffered prejudice as a result of" her employer's violations).

Based on the foregoing,

IT IS ORDERED:

1. Carol Snyder's Motion to Exclude Defendants' Rebuttal Evidence, or in the Alternative, for Leave to Submit Sur-Reply (Filing No. 54) is denied.
2. The Nebraska Medical Center and Nebraska Medicine's Motion for Summary Judgment (Filing No. 36) is granted.
3. This case is dismissed with prejudice.
4. A separate judgment will issue.

Dated this 10th day of August 2021.

BY THE COURT:

Robert F. Rossiter, Jr.
Chief United States District Judge